JAMES LEIGHTON et al., Appellants, v. MARY T. LEIGHTON, Appellee, et al., Appellants.

**DEEDS:** **Validity.** Evidence reviewed, and held insufficient to show
1   that a deed was a forgery.

**DEEDS:** Delivery—Acts Unknown to Grantee. The act of a grantor 2 of real estate in placing the deed, *without the knowledge of the grantee*, in a private box kept by grantee as a receptacle for her private papers, with the intent to vest the title in grantee, constitutes a sufficient delivery.

**EXECUTORS AND ADMINISTRATORS:** Allowance—Estoppel. The 3 act of a widow in qualifying as executrix under the will of her husband and proceeding to execute the testamentary trust and obtaining an allowance to herself for a year's support works no estoppel on her to assert her right on subsequently discovered deeds in her favor.

*Appeal from Wapello District Court.*—D. M. ANDERSON, Judge.

JUNE 22, 1923.

REHEARING DENIED DECEMBER 14, 1923.

ACTION in equity, to set aside deed and to establish the alleged right and title of the plaintiff to an interest in lands. Mary T. Leighton, grantee in the deed, denies the petition, and by cross-petition asks that her title be established and confirmed. Joseph Leighton and Alvin C. Leighton, defendants in the cross-petition, deny the same, and assert an undivided interest in the described real estate in their own right. There was a decree in favor of Mary T. Leighton, defendant, and against the other defendants and the plaintiffs. Plaintiffs and said other defendants appeal.—*Affirmed.*

*Work, Lewis & Work, Gilmore & Moon,* and *Stipp, Perry, Bannister & Starzinger,* for appellants.

*McNett & McNett* and *Jaques, Tisdale & Jaques,* for appellee.

WEAVER, J.—Alvin C. Leighton, a long-time resident and business man of the city of Ottumwa, died testate, July 1, 1917. He had accumulated a considerable estate. Prior to the date of the deed, the validity of which is now in question, he had acquired title to the property known as the Leighton Block, in Ottumwa. The property was well improved, and of considerable value, wit-

1. DEEDS: validity.

nesses appraising it at about $100,000. He had other real estate in California and Arkansas, and perhaps elsewhere. The will left by him was evidently prepared by himself, and during his later years, it had been subjected to numerous changes and modifications by him. He left surviving him his wife, the defendant Mary T. Leighton. They had lived together in married life nearly half a century, but no children had been born to them; but he was the father of a natural son by another woman, and to this son, who is now dead, had been born two children, James Leighton and Emily Frances Leighton, his only lineal descendants. Other persons mentioned in the will were two nephews, Alvin C. Leighton and Joseph Leighton, and a cousin, Flora Leighton. His will named his wife as trustee of his estate and executrix of the will without bond. The instrument contained many intricate provisions, created various trusts, and provided benefits of varying amounts, dependent on the amount or value of the estate left by him. It was duly proved, and she entered upon the discharge of the duties pertaining to her appointment. On her application, also, the will was submitted to the court for construction of its provisions, and decree was entered thereon. The particular statement of such judicial construction has no immediate bearing upon the issues here to be considered. Very soon after such construction had been adjudicated, the widow filed her written election to renounce the benefits provided for her by that instrument, and to take advantage of her statutory right to share in the estate. Thereafter, on or about September 20, 1919, the widow placed upon record in the office of the recorder of Wapello County an instrument bearing date of April 21, 1900, purporting to be a warranty deed executed by A. C. Leighton, conveying to her the title to the Leighton Block, by its proper description. Relying upon said deed, said defendant asserted and still asserts and maintains her claim to be the absolute owner of said property in her own right.

The defendants deny the validity of the deed, denounce it as a forgery, and deny that there has ever been a valid and sufficient delivery thereof.

I. This issue is the vital question in the case, and upon it has been waged a most determined contest by the parties in

interest, aided by eminent and able counsel on either side. The record of the pleadings and testimony, and the briefs of counsel, with an immense number of exhibits, aggregating 1,500 printed pages, have been laid before us. Much of this mass of material might better have been omitted, but we appreciate the difficulty under which counsel in such cases labor in deciding what items or portions of the record below can be safely left out. The trial court, as we have seen, held with the defendant, and sustained the validity of the deed. The issue is essentially one of .fact. It is also an issue upon which the appellants necessarily have the burden of proof. To sustain that burden, counsel point to the alleged unreasonable character of the widow's explanation of her possession of the deed. It is to be admitted at the outset that, if the story told by her were not aided by other indisputable circumstances, the criticism made upon it would have much weight. According to her statement, she had for many years a small box, in which she kept her personal papers and documents. The box had belonged to her mother before her, and had been preserved by her as a depository for her private use. It was marked with her name, written or placed thereon by her husband in his lifetime. She herself carried the only key thereto of which she had knowledge, but she says that her husband at times put papers in the same box. The box itself was kept by her, some of the time at her home, and other times in the safe at her husband's office, or in the vault of the bank where they did business. During Leighton's lifetime, it seems to be conceded, or not denied, he made a deed to his wife of their homestead. The deed was accompanied by an abstract of title, to which reference will later be made. Soon after Leighton's death, the appellee found in her box deeds executed to her by him for the California property, and for the property in Arkansas. This discovery was her first knowledge of the making or existence of these deeds. The California deed had attached to it, by a wire clip, a written memorandum, in Leighton's handwriting, as follows:

"May 29, 1903.

"This deed to be sent to Los Angeles for record in the event of my death if I am still the owner of the lots. This deed is

made to save administration expense. Should a portion of the lots have been sold before my death, such lots can be erased from deed before sending forward for record. Of course, this is only to be done should my wife survive me.

"A. C. Leighton."

These deeds were at once recorded. In the same box there was another package, containing the deed and abstract of title to the homestead. This package was wrapped, and tied by a tape, and upon it was indorsed the word "Home," and, according to the witness, it was not then opened or examined. Later, it appeared that, during his lifetime, Leighton had entered into contracts to convey to purchasers two lots in Omaha, Nebraska, the deeds for which had not been delivered at the time of his death. The purchasers having then demanded conveyance, a search through Leighton's papers was made, and a deed for one of the lots, duly executed, was found and delivered. On the theory that a deed to the other lot must also have been made, and that, if found, it would save the expense of probate proceedings in Nebraska, search was renewed and continued by the appellee and one Benson, appellee's nephew and business manager; and on the suggestion of the latter, appellee again brought out the box to which reference has been made, and its contents were examined. On this occasion, the package marked "Home" was for the first time untied, and when it was opened, there appeared, folded therein, the deed to appellee of the Market Street property, or "Leighton Block," so-called. According to these witnesses, there was attached to it by a clip a written memorandum, in the handwriting of the deceased, as follows: "To be recorded at my death." This slip has been lost, and is not in the record, except as shown by the testimony of appellee and Benson. Immediately upon the finding of this deed, it was recorded, and the instrument has since been in the widow's possession.

Much stress is placed by counsel for appellants upon the thought that the delay in the alleged discovery and production of the deed for two years stamps it as a fraud, and justifies the conclusion that the instrument is spurious. As we have already suggested, if the truth of this story depended alone on the verac-

ity of the appellee or of her nephew, it might well be thought to demand hesitation in holding it sufficient. This is not to say that the statements of the witnesses are so glaringly unreasonable or unnatural as to compel disbelief, but is a recognition of the fact that the interest of a witness in the result of the case in which he testifies cannot safely be overlooked in determining the credibility and weight of his testimony. The experience of courts and lawyers demonstrates that, no matter how high or low the rank or personal character or social standing of a witness may be, it remains true that, "when self the wavering balance shakes, it is rarely right adjusted;" and the careful court or juror will not omit consideration of that factor in his conclusion upon the merits of a dispute. Interest, however, does not as a rule disqualify a witness, nor will it alone justify the court in disregarding it, especially if the evidence in question has reasonable support or corroboration from other credible sources.

Passing, for the present, the effect to be accorded to the personal testimony of the appellee, it is proper to consider the argument of the appellants with respect to the physical condition and appearance of the deed, a photographic copy of which is in the abstract. It is made upon a printed blank, of the usual and familiar form in common use, and used in Iowa. Except the description of the property, and the word "Wapello," which are typewritten, the blanks are filled in with pen and ink. It is dated April 21, 1906. The certificate of acknowledgment is signed by Emmet A. Work, notary public of Wapello County, with the impress of his notarial seal. The signature of A. C. Leighton, subscribed to the deed, is also witnessed by Mr. Work. It is shown beyond doubt that, excepting the signature of the notary public, all that part of the deed written in pen and ink is in the handwriting of the deceased, A. C. Leighton. The features of the instrument on which counsel rely to sustain their theory of its false and fraudulent character are the following: In the blank provided for the name of the county in which the property is situated, appears to have been first written the word "Los Angeles." Through this word a pen and ink line has been drawn, and "Wapello" inserted by a typewriter. Following the name of the county, the printed blank had the word "Iowa." An ink line had apparently been drawn through this

word, and the word "California" written above it. Then, at some time, the pen had been drawn through the word "California," and the word "Iowa" restored. Thus it appears that, in its original form, the grantor had begun to construct a deed for property in Los Angeles County, California, while in its changed form it purports to convey property in Wapello County, Iowa. The theory upon which appellants explain this deed and its peculiarities is that Leighton contemplated at first a conveyance of California property to his wife, and made it in blank as to the appropriate description, intending probably to complete and deliver it at some time in the future; but that he never, in fact, did it; and that, after his death, the appellee, or some other person in her interest, finding the instrument in such incomplete condition, wrongfully and fraudulently made the erasures, and filled in the typewritten description of the Leighton Block property, thereby making it, in form, a conveyance of the fee to his wife. The truth of such a charge cannot be presumed, and it must be established, if at all, by clear and satisfactory evidence. An alleged act of extreme wickedness and depravity is not to be inferred from facts or circumstances which are reasonably consistent with good faith and honesty of purpose. No witness testifying in the case pretends to any knowledge of such wrongful acts; and while a charge of fraud and perjury, like other disputed matters of fact, may be established circumstantially, it should not be made to rest upon any doubtful or uncertain showing. The appellee's claim under the deed does not depend upon her uncorroborated word. That Leighton did intend to make a conveyance to his wife finds corroboration in many supporting circumstances. The notary testifies to the genuineness of his certificate of acknowledgment of the deed. It was on the same date that Leighton made the conveyance to his wife of the land in Arkansas. On May 29, 1903, he made to his wife a deed of the lots owned by him in Pasadena, California, to which the slip already referred to was attached. It was about this time that the homestead, the title to which had been conveyed back and forth between them, was finally deeded to appellee. In April, 1906, Leighton made a trip to California, and met with an accident, or near accident, which seems to have emphasized to his mind the necessity of safeguarding the inter-

ests of his wife; and he expressed himself as startled at the thought of the situation in which his wife would be left, if he should be suddenly taken away; and on his return, he told Benson he was going to deed the Leighton Block to his wife, and related the story of his accident, saying: "If I had been killed, God knows what would have happened to my wife." Margaret Benson, who had lived for years with the deceased, as a member of his family, says he told her, on a number of occasions, that he wanted his wife to have the Leighton Block, so that she would be assured of an income that would make her comfortable. To Mr. Merrill, a prominent business man and friend in Ottumwa, he talked with respect to business and property matters, saying that he did not own the Leighton Block; that it belonged to his wife. This was in 1912. Margaret Brady, a typist for a local firm having an office in the Leighton Block, says that she recalls that Leighton brought to her a blank of some kind, together with a slip of paper on which was written a description of real property, and that, at his request, she copied the description into the blank; but she does not retain the particulars in her mind, and is not able to identify this deed as the paper she prepared. Three officers of a local bank recognize the appellee's box in which she kept her papers, each saying that it was she who ordinarily brought it to and removed it from the bank. Miss Benson further testifies that Leighton at times asked for access to the tin box, and that his wife would give him the key for that purpose, but that he always returned it, and that he refused to carry one for himself. To sustain the appellants' theory with respect to the character of this paper requires the court to find: (1) That the appellee and others testifying in her behalf are guilty of criminal conspiracy; (2) that, as principals or accomplices, they are guilty of forgery; and (3) that they also are guilty of willful and deliberate perjury. Now, not a thing testified to by these people or any of them is in itself so unheard-of or so out of harmony with all human experience that we may say, as a matter of law, that it is not true. Mr. Leighton is shown to have been a man whose conduct was marked by some eccentricities. He was close, and in some ways penurious. He made a practice of drawing his own papers and transacting other important business without legal assistance. Papers

prepared by him often showed erasures and changes, his instinct for saving apparently inducing him to make use of a paper showing patches and changes, rather than to waste time or money to get a clean copy. If, having determined to deed this property to his wife, he found this partially filled blank in his desk, it would have been entirely consistent with his peculiarities to work it over into a conveyance of the Leighton Block; and the finding of an accommodating typist willing to write in the proper description for an honorarium of 25 cents would make a strong appeal to his business mind. There is no evidence which reflects upon the character or standing of the persons alleged to be guilty of these wrongs. The appellee is a woman of advanced age, and in frail health. For most of her lifetime, she has been a resident of Ottumwa, where she must be well and familiarly known; but aside from the imputations cast upon her by the charges in this case, her integrity and veracity are unimpeached. Benson seems to have stood high in the esteem of the deceased, who made him his business agent and assistant; and since the death of Leighton, he has continued to serve the widow in the same capacity. His interest in the case is not so direct or so great that we may discredit him on that account alone. The other supporting witnesses show no indication of undue bias or of purpose to distort the facts of which they speak. There is also to be said that the intent and purpose of Leighton to make his wife the beneficiary of such a gift are not inherently unreasonable. Husband and wife, they had lived together in harmony for more than an average lifetime. There is much in the record to indicate that, notwithstanding the somewhat imperious and commanding temperament of the man, he cherished his life companion with tender regard. She was the one person nearest to him in all the world, and if he saw fit to make certain of her comfort and support by vesting her with this income-bearing property, who may rightfully complain of his act or challenge his widow's right to enjoy it? Without going further into the record on this phase of the case, we are well satisfied that the charge that the deed is the product of fraud and forgery is not sustained.

II.    The next and, in our view, the only other debatable issue, is raised by the appellants' contention that the deed is not

shown to have been delivered. That delivery is essential to the

2. DEEDS: de-
livery: acts
unknown to
grantee.

validity of a deed is not open to question. The real inquiry is whether the facts shown as constituting a delivery have that legal effect. The word is perhaps most commonly used to express the idea of passing or transferring the actual possession of the written instrument by the grantor to the grantee, or, to use the technical phrase, the "manual tradition" of such instrument from grantor to grantee, with the intent to vest the title to the property in the latter. In the early history of the law, the conveyance of land was hedged about with much formality, and ordinarily a failure to literally and strictly observe the same was the fruitful source of trouble and litigation, and the question whether a deed had been delivered, simple as the inquiry may seem, was a frequent subject of controversy; and precedents discussing and passing thereon from various angles and viewpoints are very numerous, and not, at all times, entirely consistent. Under modern conditions, it is now fairly well settled that there is no inflexible or ironclad formula by which a delivery sufficient to validate or give effect to a deed is to be tested. Whether a given act shall be regarded as a delivery, within the meaning of the law, is to be determined by the proved or manifest intent of the parties; and while this is most frequently shown by the simple act of passing the manual possession of the completed instrument from grantor to grantee, such literal transfer of the paper is not indispensable to a transfer of the title to the property. Nor is the retention of a deed in the hands of the grantor necessarily inconsistent with the idea of a sufficient delivery. *Newton v. Bealer,* 41 Iowa 334; *Criswell v. Criswell,* 138 Iowa 607; *Foreman v. Archer,* 130 Iowa 52; *Tallman v. Cooke,* 39 Iowa 402; *Potter v. Potter,* 185 Iowa 559. This rule is especially applicable where the grantor stands in the relation of husband or parent to the grantee. Speaking to this point, the Illinois court has said:

"When the owner of property in good faith makes a voluntary conveyance of it to those who would naturally have a claim upon his bounty, courts of equity are strongly inclined to uphold the conveyance, and will do so unless impelled to the opposite conclusion by strong and convincing evidence." *White v. Willard,* 232 Ill. 464 (83 N. E. 954).

The same court has said, in another case:

"The law has a regard for the relationship of the parties and the motives that are presumed to dictate such conveyances, and the degree of confidence which the parties standing in such relation, as donors and donees of valuable property, are presumed to have; and in such case the presumption of law is that there was a delivery; and when brought in question, the burden is upon the grantor, or those claiming adversely to the donee or beneficiary, to show clearly that there was no delivery." *Chapin v. Nott,* 203 Ill. 341 (67 N. E. 833).

And again:

"In cases of voluntary settlements, the mere fact that the grantor retains the deed in his possession is not conclusive against its validity, if there are no other circumstances besides the mere fact of his retaining it, to show that it was not intended to be absolute." *Henry v. Henry,* 215 Ill. 205, 211 (74 N. E. 126).

See, also, as bearing upon this proposition, *Souverbye v. Arden,* 1 Johns. Ch. (N. Y.) 240; *Bunn v. Winthrop,* 1 Johns. Ch. (N. Y.) 329; *Scrugham v. Wood,* 15 Wend. (N. Y.) 545; and, as very much in point with the instant case, *McKemey v. Ketchum,* 188 Iowa 1081.

The instant case rests upon a stronger basis than the presumption just referred to, because there is evidence of the actual manual delivery of the deed to the wife. True, she does not show nor claim that she knew of the deposit of the deed in her box until after the grantor's death. But her personal knowledge of the act was not, as we shall see, essential to the effectiveness of the delivery. The placing of the deed in her private box was placing it in her possession, and the intention that it should operate as a delivery and an effective conveyance is to be presumed from the language of the instrument itself. The conveyance, being regular in form, and containing no provision or condition imposing upon the wife any obligation or burden, is of such valuable character that her acceptance of it is taken for granted, even though she had no knowledge of its existence until after her husband's death. *In re Estate of Bell,* 150 Iowa 725, and cases there cited. That the box in which the deed was found belonged to appellee, and was used by her as a place for

the deposit and safe-keeping of her valuable papers, is shown beyond a reasonable doubt. That her husband knew and recognized this fact is scarcely less certain. That he at times had access to the box is to be admitted. That he placed the deed therein is not so directly shown; but the circumstances as to which there is no material dispute in the evidence under such inference are quite irresistible. No other inference is possible, unless we jump to the conclusion that this woman and Benson and Mrs. Gove are all utterly unworthy of belief, a conclusion for which we find no warrant in the record. As we have hereinbefore intimated, the most unfavorable circumstance affecting the alleged discovery of the deed is in the delay attending it, but we think the explanation is by no means incredible. The deed and title to the home property had admittedly become hers as far back as 1903. It was not the subject of any dispute or controversy between her and the heirs. The deed and abstract of title were in a separate package, tied, and marked "Home;" and while she had opened the box on several occasions after the death of her husband, to put in or take out other papers, it is not particularly strange that she had not opened this package, apparently containing only matters concerning which there was no dispute, and no occasion for special examination. Counsel very properly concede that a delivery may be effected by words without acts or by acts without words; and we may add that one can hardly conceive of a clearer case of delivery of the latter character than is shown by the act of a grantor who prepares, signs, and acknowledges a deed, complete and perfect in form, to his wife, son, or daughter, and then, in perfect silence, puts the instrument into the possession of the grantee, where he leaves it, without recall or withdrawal, for the remainder of his lifetime. Evidence that, after the date of the deed, Leighton continued in the active control of the property, and was accustomed to speak of it as his own, listed it for assessment, leased it, and did other things consistent with the appearance of ownership in himself, is a legitimate circumstance for consideration, but in itself is not a matter of controlling importance. Such assumption of right and authority by a husband, with reference to property of his wife, especially where the wife depends upon the husband to care for her interests, is by no means uncommon; and except

in cases where the rights of creditors or innocent purchasers are involved, it works no estoppel to limit or defeat her title.

Further discussion of the essential features of a valid delivery is not called for. Appellants concede the rule that the intent of the parties must prevail; and, applying that test to the facts shown in evidence, we hold that there was a good and sufficient delivery of the deed from Leighton to his wife.

III. It is further argued that appellant Mary T. Leighton, by causing the probate of the will, by qualifying and acting as executrix and trustee thereunder, and by asking and obtaining

3. EXECUTORS AND ADMINISTRATORS: allowance: estoppel.

a widow's allowance for a year's support, is estopped to take advantage of the deed to her. The proposition is without merit. Conceivably, the widow might be estopped in equity to assert her rights under the deed; but we find nothing of that character in this case. She was named as executor of her husband's will, and it was her duty to present it for probate and preserve the estate from loss. Her right to a statutory allowance existed independent of the terms of the will. If, as counsel say, she paid the taxes and insurance premiums on the property in question out of the trust estate in her hands, and did so before discovering the truth as to her own title, it is within the authority of the court, if such order appears to be just, to require her to make reimbursement. Such payment, if made through ignorance and honest misapprehension of her rights and duties, affords no ground, in law or equity, for holding her estopped to demand recognition of her own rights under the deed thereafter produced.

A case somewhat analogous in principle is *Matheson v. Matheson*, 139 Iowa 511. There, the husband made a deed of land to his wife, leaving it with the lawyer who drew it, with instructions to deliver it to the woman. It was so delivered. Later, he succeeded in getting possession of the paper, and destroyed it. With the title in that condition, the husband died. Supposing that the destruction of the deed had eliminated her right in the property, she listed the land as a part of her husband's estate. It was also shown that, after the deed was destroyed, the husband, in his lifetime, mortgaged the property, his wife joining therein. We there held that the widow's mis-

take as to the nature and extent of her rights worked no prejudice to the heirs, and did not estop her from claiming title under the deed which the husband destroyed.

We have also held in a recent case that the act of the widow in obtaining a year's allowance against her husband's estate did not estop her from afterward electing not to take the benefits provided by his will, and demanding her rights under the statute. See *Nick v. Nick*, 195 Iowa 351. The plea of estoppel is not sustained by the evidence.

IV. The argument upon the legal proposition that a deed made in blank, or without designating the property to be conveyed, is void, appears to us to be without relevance or application to the case before us. No deed of that character is before us, and no claim is based upon such an instrument. It is true that there is evidence tending to show that, as first prepared, the blank in the deed for the description of the property was not filled in; and if it were shown that, when delivered, the blank remained unfilled, or if it were now unfilled, it would be a void instrument. But if a grantor having such an incomplete deed in his possession fills in the blank with the description of property which he has a right to convey, and delivers it to a named grantee, there is no apparent reason why such deed will not be as effective as if there had been no irregularity in its preparation.

V. Nor do we think that any estoppel can be predicated upon the fact that appellee has attempted to execute the trust created by the will. Her claim to be the owner of this property is not obnoxious to the rule which forbids a trustee from wasting or absorbing the subject of the trust for his own profit. If the deceased had conveyed away the title to the Leighton Block in his lifetime, it formed no part of the trust property, and the beneficiaries of the trust acquired no right or interest therein, either legal or equitable.

The vital issues in the case are the two mentioned at the outset, and these are: First, is the instrument in controversy the genuine act and deed of Alvin C. Leighton? Second, if the genuine character of the writing has been established, was there a valid and sufficient delivery? Since we find in the affirmative upon both these inquiries, other questions argued by counsel are

of minor importance. None of them present any features to deprive the major conclusions of their natural effect to establish and confirm the title to the property in the appellee.

The decree of the trial court is, therefore, to be affirmed. We think, however, that the costs certified to this court upon the item for printing the record are excessive in the extreme; and it is ordered that this expense be apportioned. The printing of 350 pages will be taxed to the appellee, and the remainder to the appellants.

The decree of the district court is—*Affirmed.*

PRESTON, C. J., EVANS, STEVENS, FAVILLE, and DE GRAFF, JJ., concur.